**SO ORDERED.**

**SIGNED this 28 day of April, 2017.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:                                                                                   CASE NO. 10-06466-8-DMW

THOMAS MANSFIELD GREENE
                                                                                                CHAPTER 13
        DEBTOR

MEMORANDUM OPINION AND ORDER AWARDING DAMAGES AND
SANCTIONING DITECH FINANCIAL, LLC FOR
VIOLATIONS OF DISCHARGE INJUNCTION

This matter comes on to be heard upon the Debtor's Motion for Sanctions and Damages ("Motion") filed by Thomas Mansfield Greene ("Debtor") on March 17, 2017 seeking sanctions and damages from Ditech Financial, LLC ("Ditech"). The court conducted a hearing in Raleigh, North Carolina on April 12, 2017. Cort I. Walker, Esq. appeared for the Debtor, and Michael B. Burnett, Esq. appeared for John F. Logan, Esq. ("Trustee"), Chapter 13 trustee. No one appeared at the hearing on behalf of Ditech. The Debtor tendered eleven exhibits which the court admitted into evidence. Based upon the pleadings, the case record, the testimony and evidence presented by the Debtor and the arguments of counsel, the court makes the following findings of fact and conclusions of law:

1.	This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.  The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2.	The Debtor filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on August 12, 2010.  The court appointed the Trustee to fulfill the duties as provided in 11 U.S.C. § 1302.

3.	On Schedule D filed with the court, the Debtor listed BAC Home Loans Servicing ("BAC") as a creditor with a claim pursuant to a promissory note ("Note") secured by a deed of trust on the Debtor's residence.  The Debtor filed a proof of claim on behalf of BAC in the amount of $87,334.55, including arrearage in the amount of $7,010.55.

4.	Under the terms of the Debtor's Chapter 13 plan ("Plan"), confirmed May 16, 2011, the Debtor continued making monthly payments on the Note through the Trustee and was required to pay $8,546.55 in arrears.  The amount of arrears to be paid under the Plan was slightly higher than the arrears estimated in the proof of claim filed by the Debtor, because the arrears paid through the Plan included the September and October, 2010 post-petition payments that had come due on the Note.  BAC did not file a proof of claim to amend the claim filed by the Debtor and did not object to confirmation of the Plan.

5.	On February 14, 2013, the Secretary of Veterans Affairs, as serviced by Residential Credit Solutions ("RCS"), filed notice that RCS would begin servicing the Note.

6.	The Trustee filed a Notice of Final Cure Payment and Completion of Payments Under the Plan ("Notice") on February 11, 2015, asserting that arrears of $8,546.55 and all post-petition contractual mortgage payments owed on the Note had been paid through October 1, 2014.

The Notice stated that the Debtor would begin paying RCS directly for the payment due November 1, 2014.  RCS filed a Response to the Notice on February 25, 2015, stating it agreed "that the full amount required to cure any applicable pre-petition default on Creditor's claim has been paid" and the Debtor's account with RCS was current with respect to the ongoing payments made through the Plan.[1]

7.      The Trustee subsequently filed a Motion to Declare Mortgage Payment Current stating that RCS provided the Trustee with a summary of the loan showing the principal balance due and owing to RCS as of January 23, 2015 was $56,496.42.  The court entered an Order on March 31, 2015 finding that the "pre-petition arrearage claim in the amount of $8,546.55 . . . has been paid in full" and the "principal amount due and owing to [RCS] as of January 23, 2015 was $56,496.42."

8.      The Final Report and Account ("Final Report") filed by the Trustee on May 15, 2015 states that the Trustee remitted to RCS the sum of $8,546.55, representing the full amount of pre-petition arrears.  The court entered an Order ("Discharge Order") granting the Debtor a discharge of his debts pursuant to 11 U.S.C. § 1328(a) on May 21, 2015.  The Discharge Order stated the "discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor."  After entry of the Discharge Order, the court closed the Debtor's case.

9.      The Debtor made direct payments to RCS beginning November 1, 2016 and never received any correspondence from RCS asserting the Note, according to RCS, was delinquent.

---

[1] The Response stated "Creditor agrees that the account is current with respect to all payments consistent with 11 U.S.C. § 1322(b)(5)."

3

The Debtor testified that RCS notified him that on June 1, 2016, Ditech would begin servicing the Note. A Ditech representative contacted the Debtor in June by phone and informed him that according to Ditech's records, the Debtor was $2,000.00 in arrears on the Note. The representative attempted to collect payment from the Debtor at that time. The Debtor was assigned a Ditech account representative, but despite repeated calls to the initial representative, the Debtor was unable to reach anyone to discuss the alleged arrears. Ditech subsequently sent multiple letters to the Debtor informing him of various account representatives assigned to his account. In one instance, Ditech assigned a new account representative less than two weeks after assigning a prior representative.

10. The Debtor presented at the hearing a document which he alleged to be a list of eleven different Ditech representatives, along with their phone numbers, with whom he had spoken. Every time the Debtor called Ditech, he had to re-explain the history of the Note, including the curing of arrears through his Plan, because he consistently spoke with a different representative. Each call lasted from an hour to one and one-half hours. Each representative requested different documentation from the Debtor, such as copies of canceled checks showing payment to Ditech, in apparent attempts to determine the source of the arrears. The Debtor testified he complied with all of those requests and obtained documentation of all payments, a process that involved traveling to his bank multiple times and paying for research fees and copies of bank statements and canceled checks.

11. The Debtor also wrote to Ditech at least two letters which he faxed to Ditech with copies of canceled checks attached. The Debtor had to pay for copies and faxing services at Office Max each time he faxed documents to Ditech. The Debtor called Ditech to confirm receipt of the

faxed documents and requested that someone call him, but no one from Ditech ever returned his calls.

12. The majority of Ditech representatives with whom the Debtor spoke told him he was delinquent for payments that came due after the Debtor received a discharge and resumed direct mortgage payments, although the months for which they asserted he was delinquent varied. At one point, the Debtor spoke with an account representative named "Anthony L." who informed the Debtor, contrarily, that the delinquency about which he was receiving notices was related to pre-petition arrears, not any delinquency related to the direct payments the Debtor began making November 1, 2014.

13. The Debtor tendered as an exhibit a Monthly Billing Statement ("Statement") dated February 13, 2017 which shows a "Past Due Amount" of $3,295.52. The Statement warned that "[f]ailure to bring [the] loan current may result in fees and foreclosure – the loss of your home." According to the Statement, the Debtor's "account first became delinquent on 11/02/2016" and the payments due for November, 2016 through February, 2017 remained unpaid. That information is inconsistent with Ditech's alleged assertions beginning in June, 2016 that the Note was in arrears. The Statement and its list of delinquent months appear to be computer-generated, because the overdue balance is simply applied to the most recent months. This practice frustrates borrowers' ability to identify the exact basis for any asserted delinquency. The arrears asserted in the Statement also directly contradict the canceled checks and bank statements submitted by the Debtor at the hearing.

14. The Debtor credibly testified that he has made every monthly payment due since November, 2014. The Debtor meticulously tendered as an exhibit copies of canceled checks and bank statements showing monthly payments to RCS and, subsequently, Ditech from November,

5

2014 through March, 2017. It appears the Debtor was late in making the April, 2016 payment, as the check is dated April 12, 2016 and marked received by RCS on April 18, 2016. The bank statement that would show the August, 2016 payment to Ditech is not included in the Debtor's exhibit, although the court notes that during that time period, Ditech was withdrawing funds via electronic check, so if the payment was debited successfully, it was received on time. Given the Debtor's nearly impeccable post-discharge payment history and his testimony, plus the fact that Ditech has failed to counter the Debtor's allegations, the court finds that the Debtor made all monthly payments from November, 2014 until the filing of the Motion. Even if Ditech assessed a late fee on the Debtor's account due to the tardiness of the April, 2016 payment, the amount of that fee would not explain the deficiency asserted by Ditech.

15. The Debtor also testified that he became aware of an escrow shortage on his account in recent months and increased his monthly payments to cure that arrearage. The bank statements submitted by the Debtor at the hearing show that the Debtor began paying an increased amount to Ditech each month beginning with the payment due December 1, 2016. The Debtor does not believe the escrow shortage is related to the delinquency asserted by Ditech.

16. Based on the Debtor's payment history from November, 2014 through March, 2017 and testimony about his conversation with "Anthony L." of Ditech, the court finds that the delinquency asserted by Ditech is based on pre-petition arrears that were discharged through the Debtor's Chapter 13 bankruptcy. Ditech has failed to appear and provide any alternative explanation or clarity to the court.

17. At the hearing, the Debtor testified about the events that led him to file his Chapter 13 petition. Prior to filing the petition, the Debtor lost his job and fell behind on payments to BAC. The Debtor believed BAC was considering offering a modification of the terms of the Note, but

instead discovered BAC had initiated foreclosure proceedings. The Debtor testified that he sought bankruptcy protection in order to prevent foreclosure and cure the arrears on the Note. When he received documentation showing that his mortgage was current at the end of his Chapter 13 bankruptcy, he thought he would no longer worry about delinquencies on the Note.

18. The Debtor stated that often, he received correspondence from Ditech at the end of the week and spent the weekend worrying about the status of his mortgage account. The Debtor, an Army veteran, has been diagnosed with post-traumatic stress disorder, and he testified the correspondence from Ditech "brought on a lot of tension and anxiety." The Debtor has encountered at least one individual in front of his home who was purporting to photograph the property for Ditech's records and has seen someone photograph the property in at least two other instances. At one point, the Debtor dreamed that he had been locked out of his home, a cherished possession to him and "all [he has] to show for a life's work." The Debtor contacted his bankruptcy counsel at least twelve times regarding the arrears asserted by Ditech and incurred expenses traveling to counsel's office or faxing documents to his counsel to show payment.

19. The Debtor served the Motion on RCS at the address RCS provided to the Trustee when the Debtor's case originally was pending. The Debtor served the Motion on Ditech at the address listed on the Statement, as well as by certified mail to Ditech's principal office address and registered agent address, from which return receipts were received. Neither RCS nor Ditech filed a response to the Motion.

20. Generally, "as soon as practicable after completion by the debtor of all payments under the plan, . . . the court shall grant the debtor a discharge of all debts provided for by the plan. . . ." 11 U.S.C. § 1328(a). An order of discharge and the corresponding "discharge injunction" prohibit a creditor from taking action to collect or enforce a discharged debt as a personal liability

of the debtor pursuant to 11 U.S.C. § 524(a). The Debtor's plan provided for payment of all arrears due on the Note through October, 2010, and any liability for pre-petition arrears was discharged under § 1328(a).

21. "A violation of the discharge injunction is punishable by civil sanctions pursuant to [11 U.S.C.] § 105," as the violation is treated as contempt of the discharge order. *Americorp Fin., L.L.C. v. Schwarz (In re Schwarz)*, 2016 Bankr. LEXIS 4432 (Bankr. E.D.N.C. Dec. 22, 2016) (citing *Cherry v. Arendall (In re Cherry)*, 247 B.R. 176, 187 (Bankr. E.D. Va. 2000)). The Fourth Circuit has adopted a two-part test to determine whether contempt sanctions are appropriate: "(1) whether the creditor violated the injunction, and (2) whether [it] did so willfully." *Bradley v. Fina (In re Fina)*, 550 Fed. Appx. 150, 154 (4th Cir. 2014).

22. The evidence provided by the Debtor leads the court to conclude that Ditech has been attempting to collect from the Debtor a debt that was discharged through the Debtor's bankruptcy. Ditech has violated the discharge injunction.

23. The willfulness prong of the Fourth Circuit's test for sanctions "requires only that the acts taken in violation of the injunction be intentional." *In re Fina*, 550 Fed. Appx. at 154. Courts have compared this willfulness element to willfulness in the context of a stay violation, requiring an intentional act with knowledge of the discharge injunction. *See id*. Ditech intentionally acted when it mailed statements to the Debtor, and Ditech's representatives acted intentionally any time they sought to elicit payment from the Debtor for the alleged arrears over the phone. To the extent the statements that Ditech mailed to the Debtor were computer generated, the sending of those correspondence nevertheless constitutes a willful act. *See In re Ennis*, 2015 Bankr. LEXIS 3657 (Bankr. E.D.N.C. Oct. 28, 2015). The court also notes that Ditech remains culpable even though it was not the servicer for the Note when the arrears were discharged and

Ditech never received the Discharge Order.  When a note or other obligation is transferred, the successor in interest is responsible for ensuring records are properly transferred.  Moreover, Ditech became aware of the Debtor's bankruptcy once the Debtor explained that he had cured arrears through his Chapter 13 Plan.  Ditech is in contempt of the Discharge Order.

24.     The Debtor was adversely affected by Ditech's correspondence and failure to explain adequately the alleged delinquency on the Note.  The Debtor's testimony was extremely credible as he described the eight months he has spent trying to rectify this matter.  Ditech's predecessors in interest maintained an active presence in the Debtors' case, and Ditech is a sophisticated lender familiar with bankruptcy proceedings and the United States Bankruptcy Code.  Ditech's failure to rectify its records without the involvement of this court is unacceptable.  The Debtor should be awarded actual damages as compensation for the nuisance and frustration related to the receipt of the correspondence and phone call from Ditech, as well as for time spent dealing with Ditech representatives, documenting payments, contacting counsel about the correspondence and appearing in court.  The Debtor incurred expenses related to sending proof of payment to Ditech and his counsel, as well as travel expenses.  The appropriate amount of damages to award to the Debtor is $10,000.00.

25.     The Debtor should also be awarded attorneys' fees as part of the sanction against Ditech.  Counsel for the Debtor have incurred $9,500.00 in fees for time spent reviewing the Debtor's payment records and correspondence from Ditech, attempting to resolve this matter with Ditech prior to filing the Motion, preparing and serving the Motion and preparing for and attending the hearing on the Motion.  Counsel's fees are higher than they might otherwise have been because the Debtor attempted for so many months to reconcile the balance on the Note on his own and

without the assistance of counsel. This resulted in a large amount of paperwork for Debtor's counsel to review. Counsel have incurred expenses of $500.00 related to the Motion.

26. The court also finds that Ditech should be sanctioned an additional $10,000.00, payable to the Clerk of the United States Bankruptcy Court for the Eastern District of North Carolina, for its failure to abide by the court's March 31, 2015 Order finding that the Debtor paid all pre-petition arrears in full, for ignoring the Motion and for failing to attend the hearing. This district has implemented a conduit mortgage system to account properly for mortgage payments with an order at the conclusion of plan payments deeming the mortgage current if the debtor performs. *See* E.D.N.C. LBR 3070-2. This process also provides for timely payment by the trustee. RCS, Ditech's predecessor in interest, actively participated in the conduit mortgage process, by accepting payments from the Trustee, providing the Trustee with a summary of the Note at the conclusion of Plan payments and filing a Response to the Trustee's Notice of Final Cure Payment and Completion of Payments Under the Plan. Ditech has exhibited a disregard for the process implemented by this court to safeguard debtors from exactly the type of problems the Debtor has endured. The court also notes that the way Ditech runs its call center is atrocious and is the antithesis of "customer service." Ditech should computerize its records to track customers' inquiries, so that customers are not forced to waste valuable time explaining their circumstances each time they call. Debtors under this court's jurisdiction deserve better; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The Motion is granted, and Ditech is hereby held in contempt of the Discharge Order;

2. As damages and sanctions for its contempt of the Discharge Order, Ditech shall remit the following payments within thirty days of the date of this Memorandum Opinion and Order:

    a. The amount of $10,000.00 in certified funds to the Debtor at 103 Heritage Ridge Court, Knightdale, NC 27545;

    b. The amount of $10,000.00 in certified funds to the Sasser Law Firm at 2000 Regency Parkway, Suite 230, Cary, NC 27518; and

    c. The amount of $10,000.00 in certified funds to the Clerk of the United States Bankruptcy Court at Post Office Box 791, Raleigh, NC 27602;

3. If Ditech fails to remit timely any of these payments, the court shall enter an order requiring Ditech to show cause why additional sanctions should not be imposed; and

4. The clerk is directed to keep this case open for sixty days from the date of this Memorandum Opinion and Order, to allow Debtor's counsel time to file a motion to determine the current balance of the Debtor's obligation to Ditech, if necessary.

END OF DOCUMENT